MEREDITH S. CONLEY AND MARGARET H. CONLEY, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Conley v. Commissioner
Docket No. 563-76
United States Tax Court
T.C. Memo 1977-406; 1977 Tax Ct. Memo LEXIS 35; 36 T.C.M. (CCH) 1644; T.C.M. (RIA) 770406; November 23, 1977, Filed Richard M. Conley, for petitioners. Bernard S. Mark, for respondent. DAWSON
MEMORANDUM FINDINGS OF FACT AND OPINION DAWSON, Judge: This case was assigned to and heard by Special Trial Judge Randolph F. Caldwell, Jr., pursuant to the provisions of section 7456(c) of the Internal Revenue Code of 1954, as amended, and General Order No. 5 of this Court. [1] The Court agrees with and adopts the opinion of Special Trial Judge Caldwell which is set forth below. OPINION OF SPECIAL TRIAL JUDGE CALDWELL, Special Trial Judge: Respondent determined a deficiency in petitioners' 1973 Federal income taxes *37 in the amount of $2,016.31. The issues for decision are whether petitioners are entitled to (1) any part of a claimed deduction of $6,935.86, which they included among the miscellaneous deductions on their 1973 return as a "Non-Recoverable Business Bad Debt"; (2) a deduction for maintaining an office in the home; and (3) a deduction, in an amount greater than that allowed by respondent, for the cost of periodicals and newspapers. FINDINGS OF FACT Some of the facts were stipulated. The stipulation of facts, together with the exhibits identified therein or attached thereto, is incorporated herein by reference. Petitioners Meredith S. Conley (hereinafter, "petitioner") and Margaret H. Conley are husband and wife whose legal residence at the time of the filing of the petition was Cranford, New Jersey. They timely filed a joint return for 1973. Issue 1 -- "NON-RECOVERABLE BUSINESS BAD DEBT"
FINDINGS OF FACT Petitioner has been for many years engaged in public relations work. Prior to forming Meredith S. Conley, Inc. (more fully described herein below), he had been a public relations management supervisor with J. Walter Thompson and a public relations manager and vice *38 president of Ted Bates & Co., Inc.
In 1969, petitioner decided to form his own public relations firm and for this purpose he organized Meredith S. Conley, Inc. (hereinafter, "the corporation"), a New Jersey corporation. The corporation issued only common capital stock, and it was authorized to issue 10,000 shares with a par value of $1 per share. Over the period from May 22, 1969, through October 8, 1970, it issued 1,124 shares, 700 of which (approximately 62 per cent) were issued to petitioner on May 22. Petitioner did not pay in any money for the shares issued to him; rather, his shares were issued in exchange for services rendered in organizing the corporation and to be rendered thereafter as the corporation's chief executive officer. The other stockholders paid in from $20 to $25 per share for the stock issued to them. Petitioner was president and chairman of the board of directors. The corporation began business operations on July 1, 1969, at its office in New York City. Although it was successful in attracting several substantial clients during 1969 and the early part of 1970, economic conditions in the spring and latter part of 1970 (a nationwide mail strike, the *39 President's imposition of wage and price controls, and an economic recession) caused the business of the corporation to suffer. Its clients began to take longer in paying the fees charged to them, and some of them indicated that they might cancel or shorten the terms of their contracts. The impact of such conditions, coupled with the relatively small amounts paid in for its stock, created a cash-flow problem for the corporation. The corporation sought loans unsuccessfully from two New York banks. Petitioner individually also sought bank loans, but was unsuccessful. In these circumstances, petitioner and his wife, in their individual capacities, in December 1970 negotiated two 36-month installment loans, one from Household Finance Corporation, and the other from Beneficial Finance Corporation. The Household Finance loan was for $1,400. Petitioner expended $544.92 of this amount to defray the cost of travel on the corporation's business; and he transferred the remaining $855.08 to the corporation on December 23, 1970, which was deposited in its bank account. The transfer of funds was reflected in the corporation's general journal as a "loan from MSC [Meredith S. Conley]". *40 Petitioner and his wife thereafter repaid the Household Finance loan by checks on their individual account, and such repayments totaled $624 in 1973. The face amount of the Beneficial Finance loan is not established by evidence in the record. However, the evidence does establish that $1,041.85 was transferred to the corporation on December 17, 1970, which was reflected in its general journal as a "loan from MSC" and which was deposited in its bank account. Any loan proceeds in excess of the amount so transferred and deposited were utilized by petitioner in defraying expenses of the corporation. This loan too was repaid by petitioner and his wife by checks on their individual account, and such repayments totaled $624 in 1973. The funds thus transferred to the corporation were used by it to meet payroll and other of its current operating expenses. By January 1971, petitioner could see that the corporation was not going to be successful. In April 1971, it discharged its clerical employees; and by the end of July of that year the remaining members of its staff were discharged leaving only petitioner. The corporation's last public relations business was done on or about July *41 31. Petitioner kept the corporation office in New York open until October 18, paying liabilities and endeavoring to collect its accounts receivable and to sell the corporation to some other business which might be able to use its substantial operating losses to a tax advantage. Its books were closed on october 31, 1971. The corporation paid no state franchise taxes after 1971; but it remained in existence throughout 1973. As appears from the foregoing, the corporation was not successful. It had an accumulated deficit in earnings and profits of $63,907 as of August 31, 1970. After suffering a net loss of $29,654 for its fiscal year ended July 31, 1971, that deficit was increased by $93,561 as of the last mentioned date. There were many liabilities of the corporation which remained unpaid, among which were those for unpaid Federal and New York State withholding taxes, New York unemployment insurance taxes and for supplies furnished and services rendered. In addition to such liabilities, the corporation remained liable for $300 per month rent on its 5-year lease running from July 1, 1969 (the difference between the rent stated in the lease of $900 per month and the $600 which *42 the corporation realized from a sublessee to whom the premises had been subleased). After the corporation had ceased doing business, petitioner first was employed by Daniel J. Edelman, the sixth largest public relations firm in the country, as its senior vice president and general manager, and then by Infoplan International, Inc., the public relations arm of the Interpublic Group of Companies. Petitioner regarded it as essential for a person involved in public relations to be viewed by the media representatives and by the public relations and advertising community generally as a person of credibility and sound reputation in order that his clients and their products and services might receive the coverage and mention in newspapers and magazines and on radio and television which he sought for them. Petitioner accordingly chose to attempt himself to pay and satisfy the debts and obligations of the corporation, rather than having it placed in bankruptcy or having his wages garnished by the Government for the corporation's unpaid tax liabilities, in order to help to preserve his reputation and good will in the public relations field, especially since the corporation bore his name and *43 the public relations community is a small one. To this end, in 1973 petitioner and his wife from time to time during that year, obtained cash advances from such sources as Master Charge, BankAmericard, and Banker's Trust Credit Co., which were used to make payments on the corporation's debts and obligations. The following table shows the amounts of such cash advances which petitioner and his wife repaid in 1973: BankAmericard
$ 82.80
First National City Bank
71.04
First New Jersey Bank
100.00
Banker's Trust Credit Co.
50.00
Master Charge
311.44
The cash advances thus obtained, together with other funds (presumably including his earnings from Edelman and/or Infoplan) were utilized by petitioner to pay Burrelle's Press Clipping Services ( $85) and Treck Photographic, Inc. ($22.39) during 1973 for services rendered and supplies furnished to the corporation during 1970 and 1971, when it was actively conducting business. As to the December 17, 1970, and December 23, 1970, transfers to the corporation originating with funds borrowed by petitioners from Household Finance and Beneficial Finance, as well as with respect to the amounts paid to Treck and Burrelle, *44 no loan agreement was executed between petitioner and the corporation, and it gave no security, nor did it execute or issue any note or certificate of indebtedness, nor did it pay any interest. Petitioner also made payments to the Internal Revenue Service aggregating $3,764.80, during 1973. These payments represented the corporation's obligation to the Internal Revenue Service for amounts withheld from salaries paid to the corporation's employees for withholding tax and the employees' share as well as the corporation's share of F.I.C.A. taxes, but which had not been paid when due. On its 1971 Federal income tax return, the corporation had taken a deduction for its contribution of F.I.C.A. taxes which was not paid until paid by petitioner in 1973. Also the corporation took a deduction for "salaries and wages" which included the amounts of withholding tax and F.I.C.A. tax withheld from its employees but which was not paid until paid by petitioner in 1973. During 1973, petitioner also made payments to the New York State Income Tax Bureau totaling $800, an unspecified portion of which represented a penalty. The non-penalty portion represented the corporation's obligation for *45 New York State income taxes previously withheld from its employees but which were not paid when due. On its 1971 Federal income tax return, the corporation took a deduction for "salaries and wages" which included the amount of New York State income taxes withheld from its employees but which were not paid until paid by petitioner in 1973. During 1973, petitioner also made payments to the New York State Bureau of Labor totaling $261. These payments represented the corporation's obligation for New York State unemployment insurance which was not paid when due. On its 1971 Federal income tax return the corporation took a deduction for workmen's compensation (unemployment insurance) which was not paid until paid by petitioner in 1973. Petitioner, as president of the corporation, was personally liable for its unpaid Federal and State withholding and F.I.C.A. taxes and the unemployment insurance, which he paid as described above. At some time after October 1971 and prior to January 1973, petitioner, as president of the corporation, consulted Alexander Freiser, an attorney, to determine if the corporation could terminate its liability under the lease of its office premises. It *46 was unable to do so. Petitioner paid Freiser $35 for his services. Among the Miscellaneous Deductions included on Schedule A (Itemized Deductions) of petitioners' 1973 return was one for "Non-Recoverable Business Bad Debt", in the amount of $6,935.86. That deduction was comprised of the following items: Household Finance Corporation
$ 624.00
Beneficial Finance Corporation
624.00
Century Letter Co.
100.00
Alexander Freiser
35.00
Burrelleis [Burrelle's]
85.00
Trek [Treck] Photo
22.39
BankAmericard
54.00
First National City Bank
82.04
First New Jersey Bank
100.00
Banker's Trust Credit Co.
60.00
Master Charge
323.63
Internal Revenue Service
3,764.80
New York State Income Tax Bureau
800.00
New York State Bureau of Labor
261.00
$ 6,935.86
In the statutory notice of deficiency, respondent treated as a nonbusiness bad debt $1,791.00 of the foregoing amount. $1,000.00 thereof was allowed as a short-term capital loss in 1973, leaving the amount of $791.00 as a carryover to 1974. The $1,791.00 was comprised of the following: Household Finance Corporation
$573.98
Beneficial Finance Corporation
521.80
Alexander Freiser
35.00
Burrelle's
85.00
Treck Photo
22.39
BankAmericard
82.00
First New Jersey Bank
100.00
Banker's Trust Credit Co.
60.00
Master Charge
310.89
1,791.06 *
*47 In an amendment to his answer respondent alleged that petitioners are not entitled to the $1,000 short-term capital loss allowed in the statutory notice, for the reason that the non-business debt did not become worthless in 1973. Respondent accordingly sought an increased deficiency for 1973 in the amount of $297.60. OPINION At the threshold of this first issue, it is necessary to make a broad division among the items in dispute, and to put to one side several of those items which, we believe, are not deductible in any event in this case. Those items are the repayments made on the 1970 loans and the repayments of the cash advances obtained in 1973 from the several credit card companies. Those items represent the repayment of personal loans obtained by petitioners. Repayment of those loans was not the repayment of the corporation's obligations. To be sure, utilization of the proceeds of those loans, to the extent that they are shown to have been for paying the corporation's obligations, may give rise to deductions by petitioner or increase the basis of petitioner's stock in the corporation. However, to the *48 extent that such repayments in 1973 included any interest, such interest would be deductible by petitioner under section 163. If the parties are able to determine the interest portion of the repayments, petitioner should be allowed a deduction therefor in the computation under Rule 155. Further, it is to be noted that petitioner concedes that $100the paid to Century Letter Company was paid in 1972 and should not have been included in the items claimed as a deduction in 1973. Thus, left for consideration under the first issue, are the following: Alexander Freiser
35.00
Treck Photo
22.39
Burrelle's
85.00
Internal Revenue Service
3,764.80
New York State Income Tax Bureau
800.00
New York State Bureau of Labor
261.00
$4,968.19
Petitioner no longer contends that he is entitled to a bad debt deduction under section 166. Rather, on brief his counsel states the question to be: "Whether expenditures made by petitioner to satisfy financial liabilities of his public relations company, which used his name, were deductible by petitioner as business expenses, business losses or as losses in a transaction entered into for profit under I.R.C. § 162 *49 , 165 and 212." At the outset, we hold that even if payment by petitioner of the corporation's liabilities for unpaid F.I.C.A. and Federal withholding taxes were otherwise deductible by him under any of the cited sections, deduction would have to be disallowed on the ground that to allow the same would be to frustrate a well-defined public policy. Smith v. Commissioner,34 T.C. 1100 (1960), affd. per curiam 294 F.2d 957 (1961); Hudlow v. Commissioner,T.C. Memo 1971-218. By a parity of reasoning, we believe that petitioner's payment of the corporation's liability for unpaid New York State withholding taxes and unapid contributions to the unemployment insurance fund should not be allowed as deductions to him. See N.Y. Tax Law (McKinney) secs. 671 and 685 and N.Y. Labor Law (McKinney), secs. 501 and 570. We turn now to the residue of items for consideration: Alexander Freiser
$ 35.00
Burrelle's
85.00
Treck Photo
22.39
$142.39
Here it can be said, as it was in Lohrke v. Commissioner,48 T.C. 679, 684 (1967), "This case presents us with the question of whether one person can deduct the expenses *50 of another person." The residual items are clearly the obligations of one person (the corporation); they were paid by another (the petitioner, its principal shareholder). As was said in Gould v. Commissioner,64 T.C. 132, 134-135 (1975): Ordinarily, a shareholder may not deduct a payment made on behalf of the corporation, but must treat it as a capital expenditure. Deputy v. DuPont,308 U.S. 488 (1940); Bert B. Rand,35 T.C. 956 (1961).However, such rule is not invariable; the payment may be deducted if it is an ordinary and necessary expense of a trade or business of the shareholder. James L. Lohrke,48 T.C. 679 (1967). During the taxable year involved, petitioner was in the business of being a responsible executive, senior vice president of Infoplan International, Inc., the public relations arm of the Interpublic Group of Companies, which paid him gross wages of $22,349.58 in that year. We must decide whether petitioner's ultimate purpose in paying the corporation's obligations was to keep the corporation in existence *51 and thereby possibly reap a return on his payments through corporation profits, or whether his purpose was to protect or promote his own business, realizing a return on his payments through continued profits in that business. Cf. Lohrke v. Commissioner,supra, p. 688. After careful consideration of the record in its entirety, we are persuaded that the latter was petitioner's purpose. The corporation had never been successful. Its business operation had been long discontinued. There is no indication whatsoever that petitioner ever intended to revive the corporation's business activities. While payment of the obligations would have made the corporation slightly more attractive to a prospective purchaser interested in acquiring it for the purpose of utilizing its sizable operating losses, in that its liabilities were protanto lessened by petitioner's payments, we do not believe that petitioner's payments were made with the purpose of improving its marketability. Rather, we are persuaded that petitioner's purpose was to protect his own standing and reputation in the public relations community and thereby make him a more effective executive for Infoplan *52 and also thereby to protect and promote his earning capacity in that field. His belief, and we think it a reasonable one, was that if he had permitted the corporation, which bore his name, to go into bankruptcy, his reputation and standing in the public relations community where his livelihood was to be gained would have been injured. The only alternative petitioner had was to pay the corporation's obligations himself, and he took this alternative. We hold that the payments to Alexander Freiser, Burrelle's and Treck Photo are deductible by petitioner as ordinary and necessary expenses of petitioner's business as an executive of Infoplan International, Inc.
Issue 2 -- OFFICE IN HOME
FINDINGS OF FACT The corporation subleased its New York office in 1971. Petitioner moved the corporation's files, typewriters, and adding machine into one room of his apartment. He used this room as an office for winding up the affairs of the corporation, endeavoring to collect receivables, paying liabilities, and attempting to sell the corporation. The apartment consisted of five rooms of approximately equal size. The room which petitioner used as an office also contained two beds which *53 were used by occasional overnight guests. Otherwise, the room was used exclusively in the activities incidental to winding up the corporation's affairs. Petitioner made no use of the room in connection with his work as the senior vice president of Infoplan International. Petitioner derived no income from the corporation in 1973. Petitioners deducted $375 as office expenses, an amount equal to one month's rent for the entire apartment. Respondent disallowed the claimed deduction. OPINION Petitioner seeks deduction for the home office under section 162(a). The difficulty with petitioner's position on this issue is that he testified categorically that the home office had nothing to do with his work for Infoplan International, the only source of his income for 1973. While he was still the president of his own corporation, he derived no income from that corporation, which had long since ceased to conduct any business operations. We are unable to find that petitioner's activities in winding up the affairs of his corporation rose to the level of a trade or business within section 162(a), and consequently the home office expenses would not be deductible under that section. We *54 believe that respondent correctly characterized petitioner's use of the home office to store the corporation's files and office equipment as an incidental use motivated by considerations of personal convenience. We decide this issue for respondent. Issue 3 -- PERIODICALS AND NEWSPAPERS
FINDINGS OF FACT Petitioner's work consists of dealing with the media, and it was necessary for him to purchase periodicals and newspapers. Petitioner usually bought at least two newspapers almost daily, and periodicals such as Time and Newsweek from time to time. When he traveled on business he purchased local magazines and newspapers. Petitioner purchased these materials at newsstands, as subscription delivery was too delayed to be of benefit. Infoplan did subscribe to some of the materials, but they were routed through the office so that they were out of date by the time they reached petitioner. Petitioner kept no records of the amounts he spent for these items; he estimated that he spent one dollar per day and claimed a deduction of $360. Petitioner had a newspaper delivered to his home; but he did not include that expense in his estimate. Respondent allowed $100 of the claimed *55 deduction. OPINION Respondent does not contend that the expenses of purchasing the periodicals and newspapers were not ordinary and necessary business expenses and hence deductible under section 162. Accordingly, the only determination to be made is the amount of the deduction. After due and careful consideration, we find that petitioner incurred expenses of $1 (one dollar) per day for periodicals and newspapers on 250 days of the year. Accordingly, we find that petitioner is entitled to a deduction in the amount of $250. Cohan v. Commissioner,39 F.2d 540 (2d Cir. 1930). * * *
It will be remembered that in the statutory notice of deficiency, respondent allowed petitioner a deduction for a short-term capital loss of $1,000 on the theory that petitioner had sustained a nonbusiness bad debt of $1,791 in 1973, rather than a business bad debt. By amendment to his answer, he has sought to disallow the capital loss, and seeks an increased deficiency on the ground that the worthlessness of the debt did not occur in 1973. Since we are convinced that there was no debtor-creditor relationship established between petitioner and the corporation -- and we note *56 that petitioner is no longer contending for a bad debt deduction -- no deduction for a short-term capital loss stemming from a nonbusiness bad debt under section 166e8d) is allowable. Respondent's claim for an increased deficiency is accordingly approved. In accordance with the foregoing, Decision will be entered under Rule 155. Footnotes
1. Pursuant to General Order No. 5 dated October 1, 1976, the post-trial procedures set forth in Rule 182, Tax Court Rules of Practice and Procedure↩, are not applicable to this case.
*. The six cents were disregarded in the statutory notice.↩